# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**JAMES SHERMAN,**

    Plaintiff,

  v.                                          Case No. 17-CV-1446

**WALMART,**

    Defendant.

## DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

    James Sherman, an African-American, files this lawsuit against his former employer, Walmart, alleging that he was wrongfully terminated on the basis of race and subjected to a racially hostile work environment in violation of federal and state law. (Second Am. Compl., Docket # 8.) Walmart has filed a motion for summary judgment. (Docket # 23.) For the reasons below, the motion will be granted.

## UNDISPUTED FACTS

    Sherman is proceeding *pro se*, and Walmart properly included the notice to *pro se* parties pursuant to Civil L.R. 56(a)(1) (E.D. Wis.) that an opposing party's materials must be submitted within 30 days, and that Walmart's factual assertions would be accepted as true unless Sherman submitted his own affidavit, declaration, or other admissible documentary evidence contradicting the factual assertion. (Docket # 23 at 5–6.) Sherman failed to file a memorandum by the deadline of March 18, 2019. On April 18, 2019, I ordered Sherman to show cause for his failure to respond, and warned that failure to show good cause would result in dismissal of this action with prejudice. (Docket # 32.) On April

26, 2019, Sherman filed a memorandum in response to both the show cause order and the summary judgment motion. (Docket # 33.) He stated that he had been traveling for a new job for the previous two months. (*Id.*) He did not include responses to Walmart's proposed findings of fact, any additional facts, or any other materials to support his memorandum. His memorandum does not cite to evidence in the record to support contrary facts he alleges.

I will excuse the untimeliness of Sherman's response because Sherman is proceeding *pro se* and I see no prejudice to Walmart by the one-month delay. However, because Sherman does not adequately contest or provide evidence to controvert Walmart's proposed findings of fact, Walmart's proposed findings of fact (Docket # 25) are deemed admitted for purposes of this motion. Civil L.R. 56(b)(4). *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("A district court is not required to wade through improper denials and legal argument in search of a genuinely disputed fact. And a mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material.") (internal quotations and citations omitted).

Sherman began working at Walmart in 2001. (PFOF ¶ 3.) Sherman worked at Walmart for fifteen years, working his way up from being an hourly supervisor to a Store Manager. (PFOF ¶¶ 4–5.) He was trained on Walmart's Global Statement of Ethics and its Discrimination & Harassment Prevention Policies. (PFOF ¶¶ 1–2, 6.) In April of 2013, Sherman received his First Written Coaching as a Store Manager because he bought a round of alcoholic drinks for his subordinates who attended a Walmart-sponsored charity event with him and accompanied them to a bar after the event. (PFOF ¶ 7.)

Sherman became the Store Manager at Store 2828 in Milwaukee in April 2015. (PFOF ¶ 8.) As the Store Manager, it was Sherman's responsibility to make sure that the store was operating pursuant to Walmart's guidelines and met its revenue goals. (PFOF ¶ 9.) Sherman led a team of subordinate managers, including Co-Managers and Assistant Store Managers, as well as hourly Associates. (PFOF ¶ 10.) Sherman made hiring and firing decisions as well as coaching decisions. (PFOF ¶ 11.) One of the main responsibilities of a Store Manager is to conduct what are called "4 x 4 tours" of the store every day, walking up and down the store's aisles to verify that each four-foot section of shelves are in order, items are stocked and priced correctly, and the area is clean. (PFOF ¶¶ 17–20.)

As a Store Manager, Sherman reported to a Market Manager whose job is to hold the Store Manager accountable for the operation of the store. (PFOF ¶ 13.) For most of the time that Sherman was the Store Manager at Store 2828, he reported to Market Manager Tonia Logan. (PFOF ¶ 14.) Logan, in turn, reported to Regional Manager Todd Peterson. (PFOF ¶ 15.) Both Logan and Peterson would visit Store 2828 and tour the store in order to point out areas that needed improvement. (PFOF ¶ 16.) Logan performed walk-throughs of all seven of the stores for which she was responsible at least weekly. (PFOF ¶ 30.) Logan would meet with the Store Managers and subordinate managers, walk through the store with them, and point out areas that required improvement. (PFOF ¶ 31.) Logan would provide documentation of her walk-through to the Store Manager, consisting of notes of what she expected to be corrected or improved by the time of the next walk-through. (PFOF ¶ 32.) Oftentimes, Sherman ignored Logan's walk-through comments or would walk away from Logan, and other times he would not attend the walk-through at all. (PFOF ¶ 33.)

Store 2828 was in bad shape when Sherman took it over in April of 2015, and initially Peterson believed that Sherman was working on the issues and moving it in a better direction. (PFOF ¶ 21.) Store 2828 was a Complex Store, which means that a variety of factors make it more challenging and/or expensive to operate. (PFOF ¶ 22.) It was Peterson's impression that Sherman seemed to think that if his sales were good, he was performing well, even though he was falling behind in terms of Walmart's processes. (PFOF ¶ 23.) Peterson observed that Store 2828 regularly had gaps on its shelves, pallets on the sales floor, and the backroom was clogged with inventory, but Sherman did not correct those problems. (PFOF ¶ 24.) In addition, Peterson observed that Sherman was not consistent in performing the required 4 x 4 tours. (PFOF ¶ 25.)

On March 13, 2016, Peterson conducted a visit of Store 2828, after which he sent an email to Sherman noting that he observed that the store was in "rough shape with a lot of issues revolving around very basic operational standards (Zoning, outs, registers backed up, pallets of freight on the floor, associates out of dress code and not practicing the 10 ft rule, shopping carts of returns and trash spread throughout the sales floor, empty sidecounters, etc.)." (PFOF ¶ 26.) Peterson included in the email that he asked Logan to urgently react and that he hoped Sherman would do the same. (PFOF ¶ 28.) In a separate email to Logan, Peterson sent photographs documenting the poor condition of Store 2828. (PFOF ¶ 29.)

On May 23, 2016, Logan issued a First Written Coaching to Sherman for not completing store tours pursuant to Walmart's guidelines or providing guidance to and setting expectations for his management team. (PFOF ¶ 34, 36.) Logan directed Sherman to correct these deficiencies and provide Logan notes documenting the corrections made. (PFOF ¶ 35.) On July 22, 2016, Logan issued a Second Written Coaching to Sherman for

4

not completing store tours pursuant to Walmart's guidelines. (PFOF ¶ 38.) Sherman's Second Written Coaching also coached Sherman for not following Walmart/Regional direction with his scheduling by arriving late to work on two occasions without notifying the Market team. (PFOF ¶ 39.) On October 3, 2016, Logan issued a Third Written Coaching to Sherman, again for not completing store tours in accordance with Walmart's guidelines. (PFOF ¶ 41.) Sherman was not terminated, demoted, or suspended for any of these Written Coachings and they had no effect on his pay or benefits. (PFOF ¶¶ 37, 40, 42.)

Sherman disagreed with all three Written Coachings and believes Logan issued them because he was speaking up about her being inconsistent and unfair, and that she treated him differently because he called her out on her inadequacies. (PFOF ¶ 43.) Sherman believes Logan created a hostile work environment at Store 2828 by not being an effective communicator. (PFOF ¶ 44.) Sherman contends that the entirety of Store 2828—including Caucasian Associates and members of management—suffered emotional distress due to Logan's management style. (PFOF ¶ 45.)

Sherman's 2016 performance evaluation was downgraded from "Role Model" to "Exceeds Expectations" in light of his non-financial performance issues noted by both Peterson and Logan. (PFOF ¶ 46.) Notwithstanding Sherman's non-financial performance issues, because Store 2828 was performing well financially, Peterson did not feel that Sherman could be given less than an "Exceeds Expectations" ranking because 50% of the performance rating was based solely on financial metrics. (PFOF ¶ 47.)

Peterson, Regional Human Resources Manager Ramon Malavet, and Sherman met in January 2016 at Sherman's request. (PFOF ¶ 48.) At that meeting, Sherman complained about Logan's management style. (PFOF ¶ 49.) Sherman did not claim, however, that he

was being discriminated against because of his race. (PFOF ¶ 50.) Following the meeting, Malavet spoke with Logan about Sherman's concerns, and Peterson interviewed Store 2828's Co-Managers. (PFOF ¶ 51.) On February 5, 2016, Malavet and Peterson let Sherman known that the investigation did not reveal any evidence that Logan had been disrespectful to Store 2828's management team or to Sherman or that she had violated any Walmart policies. (PFOF ¶ 52.)

On March 20, 2016, Sherman emailed Peterson to see if he was coming to Store 2828 over the weekend. (PFOF ¶ 53.) Sherman indicated that he felt Logan was singling him out, and that he was taking that as a form of discrimination, but he did not say it was race discrimination. (PFOF ¶ 54.)

On March 25, 2016, Sherman emailed Senior Director of Human Resources, North Central Division Carlos Sanchez to complain about Logan. (PFOF ¶ 55.) Sherman did not say that he felt he was being discriminated against based on his race, but he referred to being "profiled" and claimed that Logan treated certain unspecified groups of people differently, citing several examples of Logan's conduct he did not agree with. (PFOF ¶ 56–57.)

In May of 2016, Malavet conducted another investigation into Sherman's complaints about Logan and summarized the results of his investigation in an email to Sanchez. (PFOF ¶¶ 58–59.) During the investigation, Malavet spoke with Sherman as well as other Store Managers in Logan's market, including an African-American man, a Caucasian woman, and two Caucasian men. (PFOF ¶¶ 60–61.) All described similar behaviors from Logan. (PFOF ¶ 62.) Malavet did not find any evidence that Sherman was treated differently from peers or treated differently because of his race. (PFOF ¶ 63.) Malavet concluded that Logan was not acting in an intentionally unethical manner or against policy. (PFOF ¶ 64.)

On or around September 15, 2016, a recently hired African-American Assistant Store Manager called the Market Office and reported that Sherman had told him that he had taken his management team to a strip club following the store's annual inventory that spring. (PFOF ¶ 84, 86.) Market Human Resources Manager Victor Escobedo commenced an ethics investigation and learned that the team had rented a "party bus" after the store inventory on March 30, 2016. (PFOF ¶¶ 85, 87.) After dinner and drinks at a bar, for which Sherman picked up the tab, the group went to a strip club. (PFOF ¶¶ 88–89.) One of the Store's female Co-Managers indicated that she was surprised and uncomfortable that they ended up at a strip club. (PFOF ¶¶ 91–93.) The investigation also revealed other objectionable behavior by Sherman. (PFOF ¶¶ 95–98.) Logan did not play any role in the investigation. (PFOF ¶ 103.)

On October 3, 2016, Sherman, who was unaware of the investigation at the time, sent Peterson an email complaining that he had been coached by Logan and that Logan had developed personal disdain for him. (PFOF ¶¶ 65–66.) Sherman also claimed that Logan's coachings were not accurate, and that she was trying to oust him from his position as Store Manager. (PFOF ¶ 67.) Sherman claimed that he was being harassed, but did not say it was on the basis of race. (PFOF ¶ 68.) Regional Human Resources Manager Ernie Ritchie investigated the matter and requested that Sherman provide him with a detailed written statement about his concerns. (PFOF ¶¶ 69, 71.)

Sherman was not aware that there was an ongoing investigation into the strip club outing until he was interviewed about it on October 27, 2016, and afterward he was concerned about the future of his employment. (PFOF ¶¶ 99–101.) In the interview,

7

Sherman was unremorseful and claimed the evening was intended as a social event with friends. (PFOF ¶ 94.)

Sherman wrote and sent his written statement about Logan's behavior to Ritchie on October 29, 2016. (PFOF ¶¶ 72–73.) Sherman claimed that he had been subjected to racism by Logan and that he was being subjected to a hostile work environment. (PFOF ¶ 74.) Ritchie investigated Sherman's concerns, including interviewing Store 2828 Co-Managers who were African-American and Native American Indian or Alaska Native. (PFOF ¶¶ 75–76.) In the investigation of Sherman's claims, Ritchie did not find anything that suggested Logan singled out African-American Store Managers or treated Sherman differently than others because of his race. (PFOF ¶¶ 78–79.) In addition to issuing Written Coachings to Sherman, Logan also issued Written Coachings to Caucasian and Hispanic Store Managers, including reprimanding them for not touring the store or executing Walmart direction. (PFOF ¶¶ 81–82.)

After completing his ethics investigation into the party bus outing, Escobedo sent a report to Walmart's Ethics division for a recommendation on accountability. (PFOF ¶ 102.) Based upon the results of the investigation, the decision to terminate Sherman's employment was made by Peterson, Malavet, Escobedo, and Ethics Manager Joanna Washington. (PFOF ¶ 104–05.) Logan was on a leave of absence at the time Sherman was terminated from his employment and played no role in the decision to terminate. (PFOF ¶¶ 109–12.) Even if Sherman had had no prior Written Coachings, the prescribed accountability for his behavior would have been to terminate his employment. (PFOF ¶ 106.) Under the same circumstances, even Walmart's best Store Manager would have been terminated. (PFOF ¶ 107.)

On November 12, 2016, Escobedo and Market Manager Steve Palacek met with Sherman to advise him that he was being terminated for Gross Misconduct-Other. (PFOF ¶ 113.) The Exit Interview document, which Escobedo read to Sherman, indicates that the investigation showed that Sherman had violated Walmart's Harassment and Discrimination Policy and that he had shown poor judgment with the trip to the strip club, which made some attendees uncomfortable and subjected them to demeaning and disrespectful behavior. (PFOF ¶¶ 114–15.) The Exit Interview also cited other behavior that intimidated subordinates. (PFOF ¶ 116.) After Sherman's employment was terminated, Peterson and Malavet met with the members of Sherman's former management team at Store 2828 to discuss the Code of Ethics and the duty to report violations. (PFOF ¶ 118.)

In a letter dated March 5, 2018 to an Equal Rights Officer of the Wisconsin Department of Workforce Development, Sherman admitted that he made an error in judgment in March 2016 by accompanying some of the salaried management team on the outing. (PFOF ¶ 119.) Sherman also admitted at his deposition that it was poor judgment as a Store Manager to go on a party bus to a strip club with his subordinates. (PFOF ¶ 120.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary

judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc.,Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Sherman alleges that he was wrongfully terminated based on false accusations by Logan, who treated him differently because of his race and created a hostile work environment. (Docket # 8 at 3.) Walmart argues that Sherman's race discrimination claim fails because many of the actions Sherman complains of, such as write-ups, do not rise to the level of legally actionable adverse employment actions (Docket # 24 at 4–5); there is no evidence Sherman was terminated because of his race; rather, he was terminated because he violated Walmart's Harassment and Discrimination Policy and showed poor judgment (*id.* at 5–7); and there is no evidence of a racially hostile work environment (*id.* at 7–9).

*1. Discriminatory Termination*

The proper standard for assessing discrimination claims "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The evidence "must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id.* While *Ortiz* disposes of the distinction between "direct" and "indirect" evidence, it does not affect the *McDonnell Douglas* burden shifting framework. *Id.* at 766; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under *McDonnell Douglas*, Sherman has the initial burden of establishing that (1) he is a member of a protected class, (2) he performed reasonably on the job in accord with his employer's legitimate expectations, (3) despite his reasonable performance, he was subjected to an adverse employment action, and (4) similarly situated employees outside of his protected class were treated more favorably by the employer. *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017). If Sherman satisfies that burden, then the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to Sherman to submit evidence that the employer's explanation is pretextual. *Id.*

Sherman puts forth no evidence beyond his own suppositions that race played a role in his termination or resulted in any other actionable adverse employment action, or even any non-actionable consequences like write-ups. Sherman's bare assertions of covert racial animus are insufficient to raise a factual dispute. *See Hanners v. Trent*, 674 F.3d 683, 694 (7th

Cir. 2012) (finding the plaintiff's subjective belief insufficient to create a genuine issue of material fact). Sherman also presents no evidence of similarly situated employees of a different race who were treated more favorably than he was. He provides no evidence of any other Store Manager who similarly violated Walmart's policies and displayed similarly poor judgment and was not fired. His claim that Logan fabricated or later wrote the write-ups of white managers in attempt to appear fair (Docket # 33 at 2) is unsupported by the record. Without evidence of comparators, "no reasonable factfinder could conclude that similarly situated employees were treated more favorably." *See Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 412 (7th Cir. 2018).

Furthermore, Walmart has articulated a legitimate, nondiscriminatory reason for terminating Sherman—his violation of Walmart's polices and his poor judgment—and Sherman has submitted no evidence showing that this was a pretext for racial animus. Therefore, no rational trier of fact could conclude that Sherman is entitled to relief on this claim, and Walmart is entitled to summary judgment as a matter of law.

    *2. Hostile Work Environment*

"To survive summary judgment on a racially . . . hostile work environment claim, and employee must provide sufficient evidence that demonstrates: '(1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability.'" *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) (quoting *Alexander v. Casio Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)). Sherman does not allege specific actions that could potentially support a claim of racial hostility in the workplace, let alone provide evidence of hostility so severe or

pervasive as to constitute violation of civil rights laws. An internal investigation found no evidence that Logan treated Sherman differently because of his race, and Sherman presents no evidence showing that she did. On the contrary, Sherman describes Logan's management and communication styles as creating a hostile environment for the entire staff. Because no rational trier of fact could conclude on these facts that Sherman was subjected to a racially hostile work environment, Walmart is entitled to summary judgment as a matter of law.

3. *Retaliation*

Sherman appears to allege that he was fired because he asked for an investigation into Logan's purportedly racist behavior. (Docket # 8 at 3.) To prove this claim, Sherman must show that he would not have been discharged but for his complaint about Logan. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). Walmart had launched an investigation into Sherman's improper behavior before he complained of racism from Logan, and even if not, Walmart had legitimate, non-retaliatory justifications for Sherman's termination: violation of Walmart policy and poor judgment that even Sherman admitted to. Sherman does not rebut evidence that his termination was a direct consequence of his inappropriate actions as a Store Manager and unrelated to his complaints about racism from Logan. No rational trier of fact would conclude that Sherman was terminated in retaliation for complaining about Logan, and Walmart is entitled to summary judgment on any such claim.

**ORDER**

**NOW, THEREFORE, IT IS ORDERED** that Walmart's motion for summary judgment (Docket # 23) is **GRANTED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 16th day of May, 2019.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge